422 A.2d 868

**Donald John NATH, Jr., Appellant,**

v.

**NATIONAL EQUIPMENT LEASING CORPORATION.**

Superior Court of Pennsylvania.

Argued April 15, 1980.

Filed Nov. 7, 1980.

Petition for Allowance of Appeal Granted Feb. 3, 1981.

144

Kenneth W. Behrend and Charles H. Staub, III, Behrend, Aronson & Morrow, Pittsburgh, for appellant.

Randall J. McConnell, Jr., Pittsburgh, for appellee.

Before SPAETH, WICKERSHAM and LIPEZ, JJ.

SPAETH, Judge:

The issue in this case is whether the doctrine of strict liability under the Restatement (Second) of Torts § 402A [1] should be applied to an equipment leasing corporation.

On March 29, 1972, appellant, Donald John Nath, was injured when his left hand became caught in the gears and blades of a wire and cable stripping machine; as a result, he lost three fingers and part of his hand. The machine had

---

1. Section 402A of the Restatement (Second) of Torts, as adopted in *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), provides:
   § 402A Special Liability of Seller of Product for Physical Harm to User or Consumer
   (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
   (a) the seller is engaged in the business of selling such a product, and
   (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
   (2) The rule stated in Subsection (1) applies although
   (a) the seller has exercised all possible care in the preparation and sale of his product, and
   (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

been leased to appellant's employer, Keystone Metals Company (now Keystone Resources), by appellee, National Equipment Leasing Corporation. In his complaint against appellee,[2] appellant alleged that appellee leased to Keystone a machine that was "unreasonably dangerous" in that it lacked a guard to protect the user's hands.[3] Appellant then, by motion for partial summary judgment, sought a ruling by the lower court that Section 402A applied to lessors such as appellee. On December 16, 1975, this motion was denied by a court *en banc*, which ruled that "the appellate courts of Pennsylvania" have not extended Section 402A to lessors. On December 23, 1975, the lower court amended its order denying appellant's motion. Noting that the issue involved "a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate Appeal from said Order may materially advance the ultimate termination of the matter," and that "Appellate State Courts in Pennsylvania have apparently not considered the issue," the lower court certified the case for appeal to this court, pursuant to 17 P.S. § 211.501. However, on January 5, 1976, this court denied appellant's Petition for Allowance of Appeal. Appellant then petitioned the Supreme Court for allowance of an appeal, and on March 3, 1976, that Court granted his petition. On June 3, 1977, the Supreme Court, with a *per curiam* opinion, remanded the case to the lower court for further consideration. The Court noted that subsequent to the order of the lower court, it had handed down its opinion in *Francioni v. Gibsonia Truck Corporation*, 472 Pa. 362, 372 A.2d 736 (1977), in which it held that Section 402A may be extended to a supplier of chattels, even though the marketing device employed is a lease. In *Francioni* the Court stated that the policy considerations justifying the extension of strict liability to the conventional lease are not present where the lessor is not marketing the product but

2. Appellant also brought an action against his employer Keystone and the manufacturer of the machine, Rigby Manufacturing Company.

3. The complaint was also based on theories of negligence and breach of implied warranty.

merely financing its acquisition. 472 Pa. at 369–70 n. 3, 372 A.2d 736, 740 n. 3. In remanding, the Court referred to this statement, saying that "[w]e express no view as to appellee's claim that the instant lease was merely a financing device. This question, along with any others that may be properly raised on remand, should first be considered by the trial court." *Nath v. National Equipment Leasing Corp.*, 473 Pa. 178, 180, n. 3, 373 A.2d 1105, 1107 n. 3 (1977).

Upon remand, the parties agreed to a trial *in limine*, limited to the issue of whether the lease in question was a conventional, commercial lease or merely a financing device. On October 20, 1978, the lower court determined that the lease was a financing device; the court stated that "there is not one shred of evidence that defendant [*i. e.*, appellee–lessor] here has by marketing and advertising placed an article in the stream of commerce." The court therefore concluded that under *Francioni*, Section 402A did not apply, and dismissed the action. On July 18, 1979, the court dismissed appellant's exceptions and entered judgment for appellee. Appellant now appeals.

–1–

A conventional, commercial lease may be defined as an instrument by which the lessor retains ownership of the particular item supplied to the lessee. The term of the lease is usually shorter than the useful life of the leased item, and at the end of the term, the lessor resumes possession of the item and either re–leases or sells it. Generally, the lessor is engaged in the business of leasing the item to others, and therefore possesses expertise with respect to it. By contrast, a finance lease resembles a sale. The lessee expects by installment payments ("rent") to pay for the item in full. The lessor generally has no expertise with respect to the item leased, and usually does not take possession of it. Rather, the lessee is the party with expertise, and it is generally the lessee that selects the equipment and negotiates the transaction. *See Hawkland, The Impact of the Uniform Commercial Code on Equipment Leasing*, 1972

U.Ill.L.F. 446, 449; *Comment, Finance Lessor's Liability for Personal Injuries,* 1974 U.Ill.L.F. 154; *Note, In re Leasing Consultants,* 84 Yale Law Journal 1722, 1723 (1975). J. White, R. Summers, Uniform Commercial Code, § 22–3 pp. 762–65 (1972). In determining whether a lease is a conventional commercial lease or a financing device, the circumstances of the particular transaction must be examined. An agreement may assume the form of a conventional commercial lease and yet upon examination prove to be a "disguised" financing device, in which the lessor's interest is not in the item itself but in the security represented by the item. 84 Yale Law Journal 1722, *supra.*

In *Francioni,* in applying Section 402A to a conventional lessor engaged in the business of leasing trucks, the Supreme Court observed that the policy behind Section 402A is to place responsibility on those who, through manufacturing and distribution, intend that products "reach the market." 472 Pa. at 367, 372 A.2d at 738, *quoting Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 187 n. 2, 242 A.2d 231, 236 n. 2 (1968); Restatement (Second) of Torts § 402A, Comments C and F. The Court went on to say:

> What is crucial to the rule of strict liability is not the means of marketing, but rather the fact of marketing, whether by sale, lease or bailment, for use and consumption by the public. *Link v. Sun Oil Co.,* [160] Ind.App. [310], 312 N.E.2d 126, 130 (1974); *Whitfield v. Cooper,* 30 Conn.Sup. 47, 298 A.2d 50 (1972); *Delaney v. Towmotor Corp.,* 339 F.2d 4, 6 (2d Cir. 1964). Where these fundamental principles are applicable, the imposition of artificial distinctions will only frustrate the intended purpose. *Id.*

In applying Section 402A to the conventional lessor, the court particularly found support in *Cintrone v. Hertz Truck Leasing & Rental Service,* 45 N.J. 434, 212 A.2d 769 (1965), where the New Jersey Supreme Court found a warranty of fitness in a lease of a truck by a company in the business of

leasing motor vehicles.[4] The New Jersey Supreme Court viewed the role of the lessor, or bailor, as follows:

A bailor for hire such as a person in the U–drive–it business, puts motor vehicles in the stream of commerce in a fashion not unlike a manufacturer or retailer. In fact, such a bailor puts the vehicle he buys and then rents to the public to more sustained use in the highways than most ordinary car purchasers. The very nature of the business is such that the bailee, his employees, passengers and the traveling public are exposed to a greater quantum of potential danger of harm from defective vehicles than usually arises out of sales by the manufacturer.

45 N.J. at 450, 212 A.2d at 777.

Drawing an analogy between the warranty of fitness and the doctrine of strict liability as applied to conventional commercial lessors, the New Jersey Court said:

. . . the analogy is compelling. In this developing area of law we perceive no sound reason why a distinction in principle should be made between the sale of a truck to the plaintiff's employer by a manufacturer and a lease for hire of the character established by the evidence . . . Most of the significant criteria which in sales transactions . . . support a cause of action based on strict liability in tort are present in the type of lessor–lessee relationship now before us.

*Id.* at 456, 212 A.2d at 781 (citations omitted).[5]

**4.** For articles tracing the development of case law on warranty liability in lease, bailment and other non–sale transactions, *see* Farnsworth, Implied Warranties of Quality in Non–Sales Cases, 57 Columbia L.Rev. 653 (1957); Miller, A "Sale of Goods" as a Prerequisite for Warranty Protection, 24 Business Lawyer 847 (1979); Murray, Under the Spreading Analogy of Article 2 of the Uniform Commercial Code, 39 Fordham L.Rev. 447 (1971).

**5.** Recent cases extending strict liability under Section 402A to lessors include: *Lechuga v. Montgomery,* 12 Ariz.App. 32, 467 P.2d 256 (1970); *Bachner v. Pearson,* 479 P.2d 319 (Alaska 1970); *Price v. Shell Oil Co.,* 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970); *Fakhoury v. Magner,* 25 Cal.App.3d 58, 101 Cal.Rptr. 473 (1972); *McClaflin v. Bayshore Equipment Rental Co.,* 274 Cal.App.2d 446, 79 Cal.Rptr. 337 (1969); *Martin v. Ryder Truck Rental, Inc.,* 353 A.2d 581 (Del.1976); *Stewart v. Budget Rent–A–Car Corp.,* 52 Haw. 71,

This reasoning has led the courts to refrain from extending strict liability to include a lessor engaged in financing an item rather than marketing or supplying it. Thus in *A–Leet Leasing Corporation v. Kingshead Corporation*, 150 N.J.Super. 384, 375 A.2d 1208 (1977), the Superior Court of New Jersey (Appellate Division) said that it did not construe *Cintrone* to apply to situations where the transaction was essentially equivalent to a sale and the lease was in reality a method of financing. *Id.* at 394, 375 A.2d at 1212–1213. In *A–Leet*, the lessor purchased from automobile dealers vehicles previously selected by individuals, then leased the vehicles back at a stipulated monthly rental, with an option to purchase at the expiration of the lease. In these circumstances, the Court stated:[6]

> It is to be noted that here Shafir [the lessee] himself selected the automobile from the dealer. The lessor was not involved at all in that process. Its role was simply to finance the transaction through the device of a leasing arrangement, although it is true that the actual purchase of the vehicle was accomplished by the lessor. In such instances, a cogent argument might be made that the lessee, unlike situations in which the lessor is a dealer in motor vehicles, does not rely upon the skill and judgment of the lessor, who may be in no better position than he to detect possible defects or flaws in the vehicle leased. Therefore, the implied warranties of merchantability or fitness for use ought not to obtain.

150 N.J. at 392, 375 A.2d at 1212.

470 P.2d 240 (1970); *Galluccio v. Hertz Corp.*, 1 Ill.App.3d 272, 274 N.E.2d 178 (1971); *Ettin v. Ava Truck Leasing, Inc.*, 53 N.J. 463, 251 A.2d 278 (1969); *Stang v. Hertz*, 83 N.M. 730, 497 P.2d 732 (1972); *Mandel v. Gulf Leasing Corp.*, 250 Pa.Super. 128, 378 A.2d 487 (1977); *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975); *George v. Tonjes*, 414 F.Supp. 1199 (W.D.Wis.1976).

6. The statement is *dictum*. The court's actual holding was that neither the implied warranties of merchantability or fitness included a commitment by a lessor of automobiles that an automobile would remain serviceable throughout the lease. The court also found that the lessee had failed to show that the automobile was defective when it left the lessor's control.

Similarly, in *All–States Leasing Co. v. Bass*, 96 Idaho 873, 538 P.2d 1177 (1975), the Supreme Court of Idaho held that a lessor of car–washing equipment who did not build, manufacture or sell machines of any kind but rather was engaged in the business of purchasing or financing the purchase of such equipment after it had been specifically selected by the lessee was a finance lessor and therefore not subject to the implied warranty provisions of the Uniform Commercial Code §§ 2–314, 2–315. The court concluded that a finance lessor was not a "merchant" as defined by the Code.[7]

The distinction thus made between a conventional, commercial lessor and a finance lessor was considered and accepted by our Supreme Court in *Francioni*. Having concluded that Section 402A should be applied to the conventional, commercial lease, the Court added the following footnote:

> 3. Appellee contends that its leasing arrangement . . . was actually a method of financing equipment and not a conventional, commercial lease. The essence of appellee's argument is that the rule of strict liability does not extend to finance lessors engaged in the business of finance leasing. We agree with the appellee that the finance lease is *sui generis* and that the policy considerations justifying an extension of the concept of strict liability to the true lease are not present when the lessor is not "marketing" or "supplying" the product, but is, in fact, *merely a secured party, or financier,* whose collateral is the "product."

472 Pa. at 369–70 n. 3, 372 A.2d at 740 n. 3.

It is therefore clear that the question we must decide is whether the lease in the present case is a conventional commercial lease, in which case under *Francioni* appellee is

7. Section 2–104(1) of the Uniform Commercial Code defines merchant as follows:

"Merchant" means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in that transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

subject to strict liability, or a finance lease, in which case appellee is not subject to strict liability.

–2–

■ In certain respects the lease in the present case has the appearance of a conventional, commercial lease. It refers to the parties as "lessor" and "lessee," and calls for the payment of "rental." One section includes this provision:

> This agreement is and is intended to be a lease, and lessee does not acquire hereby any right, title or interest in or to the equipment, except the right to use the same under the terms hereof."

(Lease subparagraph 15.)

In addition, the 5–year term (less than the estimated useful life of the machine, which appellant's witnesses claimed to be 20 years), and the provision that at the end of the term, the machine would be returned to lessor, support a conventional, commercial lease.[8]

In other respects the lease has the appearance of a finance lease. Although the term is for only five years, the lease includes an option to renew for three successive one–year periods. Also, the lessee has the option to sell the machine on the open market at the expiration of the lease, and to keep any proceeds that exceed the fair market value at the

---

8. Appellant also argues that appellee's action in taking a tax deduction for depreciation on the machine proves its ownership of the machine as a conventional commercial lessor, since according to appellant, such a deduction is not provided in the Internal Revenue Code for finance lessors. Whether a finance lessor may deduct for depreciation is a question of federal taxation law, beyond the scope of our inquiry here, although we note that at least one commentator has said that such deductions are taken by finance lessors:

> Potential tax savings are available to both the lessor and the lessee under financial leasing if the parties enter into a lease that does not run the risk of being treated as a sale by tax authorities. Principally, the lessor can take advantage of tax provisions that allow depreciation on the leased equipment as a deduction.

> Comment, Finance Lessor's Liability for Personal Injuries, *supra*, p. ——, footnotes omitted, citing: Internal Revenue Code of 1954 § 167; Stiles & Walker, Leveraged Lease Financing of Capital Equipment, 28 Business Lawyer 161 (1972).

time the lease expires. (*See* Lease, Paragraphs 8, 14). Appellee argues that since this option extended to the lessee as a possible buyer,[9] Keystone as lessee had both the option to renew the lease and the option to purchase outright the leased item—features characteristic of a finance lease rather than a conventional commercial lease.[10]

Furthermore, appellee argues that the "rental" Keystone was required to pay was actually the amount of interest (10%, spread out over the 5–year term) charged for providing the money needed to purchase the leased item and not the ordinary "rent" called for by a conventional, commercial lease. Finally, it may be noted that at the end of the 5–year term, the lessee could purchase the machine outright for 7% of its cost. One authority has noted that where the expiration of the term of the lease the lessee need pay only a small or nominal consideration in order to exercise an option to buy the leased item, "the lessor is simply a seller or other financier in lessor's clothing who has retained an interest to secure the buyer's promise to buy and pay the required installments on the purchase price." White & Summers, *supra* at —— (footnotes omitted).

On balance, the lease has more the appearance of a finance lease than a conventional, commercial lease. This conclusion is confirmed when we consider the circumstances of the lease. According to the testimony of one of Keystone's officers, it was not appellee as lessor but Keystone as lessee that, through its plant operating personnel and engineers, selected the wire and cable stripping machine for purchase. Other Keystone officials then approved the selection, and placed an order for the machine with the Rigby Manufacturing Company, which manufactured the machine. (R.R. 99a–102a) Only after the machine had been selected

9. According to the record, Keystone did sell the cable and wire stripping machine in question to a company in California, and sent the proceeds to appellee to be applied against the balance remaining due under the lease. (R.R. 104a–108a)

10. *See In re Industro Transister Corp.*, 14 U.C.C.R.S. 522 (D.N.Y. 1973), in which a New York court deemed an option to purchase "convincingly evocative" of the lessor's financier status.

and ordered did appellee enter the picture. At that time, Keystone asked appellee to finance its purchase of the machine. Appellee itself lacked sufficient funds for this purpose, and had to borrow from the Pittsburgh National Bank. Appellee asked the Rigby Manufacturing Company to reinvoice the machine to show appellee as owner (which appellee claimed was a company policy), and then prepared a lease schedule for the machine and a financing statement to be filed pursuant to the U.C.C. provisions for security interests. The machine itself was never even seen by appellee, but rather was sent directly from Rigby to Keystone as lessee.[11] Thus it is evident that Keystone regarded appellee not as a supplier of the machine but as a financier who could enable Keystone to acquire the equipment it needed for its business. This is perhaps most apparent from the evidence that it was Keystone officials who selected and ordered the machine from Rigby Manufacturing Company. The fact that appellee later requested Rigby to reinvoice the machine to show that it was the owner was more an action to protect appellee's security interest in the machine than a change in the relationship of the parties.

We therefore conclude that the lower court was correct in deciding that appellee was a finance lessor, and therefore not subject to strict liability under Section 402A.

–3–

Appellant argues, however, that even if the lease is found to be a finance lease rather than a conventional, commercial lease, still appellee should be held strictly liable under Section 402A. This is so, according to appellant, because the only basis of the distinction between conventional, commercial leases and finance leases, is the desire to "protect[ ] . . . the financing industry from undue financial burden." (Appellant's Brief at 7.) Appellant argues that since compre-

11. *See, e. g., In re Transcontinental Industries,* 3 U.C.C.R.S. 235 (D.C.Ga.1965), where a referee concluded that a lease was a security device, on evidence that the "lessor" had purchased equipment from suppliers and its concern was the financing of equipment at a profit. The referee noted that the lessor had not handled or stored the equipment, but rather had financed its acquisition.

hensive liability insurance is readily available to financiers and routinely purchased by them this policy is no longer served by exempting them from strict statutory liability. (*Id.* at 7–10.) However, we are not persuaded by this argument.

The policy behind Section 402A has been described as follows:

> [T]he justification for the strict liability has been said to be that the seller, by marketing his product for use and consumption, has undertaken and assumed a special responsibility toward any member of the consuming public who may be injured by it; that the public has the right to and does expect, in case of products which it needs and for which it is forced to rely upon the seller, that reputable sellers will stand behind their goods; that public policy demands that the burden of accidental injuries caused by products intended for consumption be placed upon those who market them, and be treated as a cost of production against which liability insurance can be obtained; and that the consumer of such products is entitled to the maximum of protection at the hands of someone, and the proper persons to afford it are those who market the products.

Restatement (Second) of Torts, § 402A, Comment C. As Justice (later Chief Justice) TRAYNOR said in his concurring opinion in *Escola v. Coca Cola Bottling Co. of Fresno*, 24 Cal.2d 453, 150 P.2d 436 (1944):

> [P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market.

*Id.* at 462, 150 P.2d at 440.

True to this policy, where courts have applied Section 402A to lessors they have based their decision on the following factors.

> (1) In some instances the lessor, like the seller, may be the only member of the marketing chain available to the injured plaintiff for redress; (2) As in the case of the

seller, imposition of strict liability upon the lessor serves as an incentive to safety; (3) The lessor will be in a better position than the consumer to prevent the circulation of defective products, and (4) The lessor can distribute the cost of compensating for injuries resulting from defects by charging for it in his business, *i. e.* by adjustment of the rental terms.

*Francioni v. Gibsonia Trucking Corp., supra,* 472 Pa. at 368–69, 372 A.2d at 739.

*See also,* B. Henszey, *Application of Strict Liability to the Leasing Industry,* 33 Bus.Lawyer 631, 637–39 (1978).

When these factors are considered here, it becomes clear, as the Supreme Court observed in *Francioni,* that the policies served by applying Section 402A to conventional, commercial lessors would not be served when the lessor is not marketing or supplying the product, but rather is merely a financier.

■ First, the finance lessor here, and probably in most cases, is not the only member of the marketing chain available to the plaintiff for recovery. Indeed, appellant here brought suit against the manufacturer of the wire and cable stripping machine that caused his injuries, and according to the record, recovered a $175,000 verdict.

■ Second, imposition of strict liability on a finance lessor is not likely to serve as an incentive to safety. The finance lessor does not take actual possession of the equipment leased, and generally lacks the expertise necessary to detect or prevent product defects. Instead, it is the lessee who undertakes the burden of maintaining the leased equipment. Thus, exposing the finance lessor to strict liability would not result in the lessor implementing practices to increase product safety. It may be said that it would result in the lessor deciding to finance products other than those that caused accidents, and that this would indirectly cause manufacturers to be more careful so that their products would be marketable, but whether such an indirect incentive would be effective is at best speculative.

■ Third, the finance lessor is not in a better position than the consumer to prevent the circulation of defective products. The lessee is by far better equipped to detect and prevent use of a defective product than is the finance lessor, for it is the lessee who selects the product, takes actual possession of it, maintains it, and in general has expertise with respect to it. The finance lessor, who merely takes the order and provides the funds necessary to purchase the product is rarely skilled or experienced enough to detect product defects.

■ Fourth, while it may be true that the finance lessor can distribute the cost of compensating for injuries resulting from defects in the product by increasing the amount of rent charged, to compel such distribution by imposing strict liability on the finance lessor would appear to penalize the finance lessee, a consumer of the product, rather than the parties who manufactured or sold the product. In any case, we are not persuaded that we should extend liability where the only policy even arguably served by the extension of strict liability to finance lessors would be that of cost absorption and distribution.

Affirmed.