**In re KEYDATA CORPORATION, Debtor.**

**KEYDATA CORPORATION, Plaintiff,**

**v.**

**INTERNATIONAL PAPER CREDIT CORPORATION, Defendant.**

**Bankruptcy No. 80–01923–JG.**
**Adv. No. A80–0720.**

United States Bankruptcy Court, D. Massachusetts.

March 24, 1982.

Charles Morse, Boston, Mass., for debtor.

Joseph Ryan, Brown, Rudnick, Freed & Gesmer, Boston, Mass., for BAT (Burgess, Anderson & Tale).

Thomas J. Ahern, Jr., Boston, Mass., for IPC (Int'l. Paper Credit Corp.).

## MEMORANDUM

JAMES N. GABRIEL, Bankruptcy Judge.

This adversary proceeding was initiated by the debtor, Keydata Corporation ("Keydata") seeking a judgment of contempt and an order directing the defendant, International Paper Credit Corp, ("IPC")[1] to pay the plaintiff $11,203.30 plus costs, attorney's fees and interest thereon.

It is agreed that IPC issued a draft to Keydata in the amount of $11,203.30 and that IPC stopped payment thereon after Keydata had filed its bankruptcy petition. Keydata alleges that this post-petition stop payment action violates the automatic stay provisions of 11 U.S.C. 362(a)(7) and also seeks to hold IPC in contempt for its apparent set-off.

Keydata and IPC agree that IPC was, at all times material hereto, a creditor of Keydata as a result of other transactions not otherwise material hereto. IPC admits that its self help set-off was improper, but asserts herein by way of counter-claim its right of set-off and seeks this Court's approval to exercise the right to the extent of $11,203.30.

The plaintiff contends that it entered into a purchase and sales agreement and did sell a computer and software package (Unity Series) to its customer Burgess, Anderson & Tate ("BAT"), that BAT needed financing and the plaintiff suggested that IPC might be interested, that, following BAT's instructions the plaintiff shipped the computer to BAT, that upon instructions from BAT the plaintiff sent its invoices to IPC, and IPC, on instructions from BAT paid the plaintiff all but $11,203.30, that finally BAT gave IPC instructions to pay the balance and in accordance therewith IPC sent the plaintiff its draft for the amount, on which IPC stopped payment post-petition.

The defendant on the other hand contends that it purchased the computer from the plaintiff and in turn leased it to BAT and that the payment in question upon instruction from BAT was sent to the plaintiff as final payment on an antecedent debt owed by it to the plaintiff thus giving the defendant the right to set it off against the debt owed it by the plaintiff.

On or about October 31, 1980 Keydata drew two checks in the amount of $13,-

---

1. Subsequent to the filing of this adversary proceeding IPC was purchased by E. F. Hutton Corp; to avoid any confusion this court will continue to refer to the defendant as IPC.

351.09 made out to IPC in payment of its account which were dishonored when the bank froze Keydata's checking account upon the filing of its Chapter 11 petition. On or about October 31, 1980 IPC transmitted the draft in question to Keydata in the amount of $11,202.30. Keydata transmitted this IPC draft to Commercial Credit Business loans ("CCBL"), a secured creditor of Keydata holding a security interest in all accounts receivable, including the alleged debt of BAT to Keydata. CCBL caused the item to be deposited for bank clearance and credit to a special banking account at State Street Bank and Trust Company, in which title to the proceeds was vested in CCBL. The deposit was made on November 3, 1980.

CCBL notified Keydata on November 6, 1980 that the IPC draft for $11,202.36 had been dishonored on presentment by Union Trust Co. of Greenwich, Connecticut, with a notation that payment had been stopped-refer to maker. The central question is whether IPC, at the time of the attempted set-off, was a debtor of Keydata which, if so, would give rise to a right of set-off under 11 U.S.C. 553.[2]

Besides the oral testimony of IPC's witness to the effect that they intended and thought that they did purchase the Unity Series from Keydata and leased it to BAT, the only other evidence submitted and heavily relied upon by IPC were invoices from Keydata addressed to IPC which billed IPC directly for the Unity Series shipped to BAT. These invoices, when viewed with cover letters, and as explained by the credible testimony of Keydata's witness were sent to IPC in that fashion for bookkeeping purposes only and were not used or intended to invoice IPC directly for goods purchased by IPC.

IPC has failed to introduce any evidence which establishes that the July 28, 1980 sale between Keydata and BAT was cancelled. Although IPC's employees testified that they carried this transaction on their books as a purchase from Keydata, and that they leased same to BAT and that IPC took all of the advantages, including tax advantage of a lease transaction with BAT, the court finds that this does not overcome the outstanding purchase and sales agreement between BAT and Keydata. It is beyond this court's belief that a sophisticated lending institution could overlook so simple yet so important a detail as obtaining a bill of sale, or other tangible evidence of an intended sale which passes title to equipment worth in excess of $120,000.

Although BAT had no ready answer as to why it entered into a lease arrangement with IPC, it nevertheless supports Keydata's position and looked upon IPC only as its lender.

■ In view of the fact that BAT selected, inspected, contracted for, and received this equipment, that IPC paid Keydata only upon authority from BAT, that Keydata signed a purchase and sale agreement with BAT prior to the time IPC entered the picture, that at all times BAT's debt was listed on Keydata's books as an account receivable, and that there is no evidence of any contract between Keydata and IPC this court finds that IPC did not purchase the equipment from Keydata and as a result there is no relation between Keydata and IPC relative to the draft in question which would give rise to a right of set-off in IPC.

This conclusion is further substantiated by a closer look at the relationship between IPC and BAT. Aside from the fact that BAT, the alleged lessee, agrees that its arrangement with IPC, the alleged lessor, is and was intended to be a security arrangement, this is substantiated by the facts.

It is well settled that "intended as security" as used in both Section 1–201(37) and Section 9–102 has little to do with the subjective intent of the parties. 1 Gilmore, Security Interests in Personal Property,

2. 11 U.S.C. Section 553:
(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that . . .

Section 11.2; Code Comment to section 9–12. The necessary intent, or lack of intent, should be determined from the effect of the parties' actions. (1 Bender's UCC Service, Secured Transactions Under the UCC, Coogan, Leases of Equipment and Other Unconventional Security Devices, Section 4A–06(10)(c).[3]

■ The Court must look not only at the intentions of the parties but the facts and the effect of their actions. Even though the determination is to be made on a case by case basis, the presence of certain factors can be indicative, including, but not limited to:

1) Whether the lessee is given an option to purchase and, if so, whether the option price is nominal;

2) Whether the lessee acquires any equity in the equipment;

3) Whether the lessee is required to bear the entire risk of loss or;

4) Pay all charges and taxes imposed on ownership;

5) Whether there is a provision for acceleration of rent payments; and

6) Whether the property was purchased specifically for lease to that lessor.

*In re All-States Leasing Co. v. Ochs*, 42 Or.App. 319, 600 P.2d 899, 27 U.C.C.Rep. Serv. 808 (1979); *In re Winston Mills, Inc.*, 6 B.R. 587, 597, (Bkrtcy., S.D.N.Y.1980).

The alleged lease agreement between the parties specifically makes BAT responsible for items 3, 4, and 5 above, and item 6 is admitted. Based upon the facts herein, item 1 is found to be in the affirmative.

■ BAT has an option to buy at the termination of the lease for fair market value. An option to purchase does not by itself make a lease a security agreement, but an agreement which provides that upon compliance with the terms of the lease, the lessee has the option to become the owner of the property for nominal consideration, makes the lease an agreement intended for security regardless of the intent of the parties. *Eimco Corp. v. Sims*, 100 Idaho 390, 598 P.2d 538 (1979). In order to determine whether fair market value is nominal we must measure the option price against fair market value at the moment the option is exercised. *In re Peacock*, 6 B.R. 922, (Bkrtcy., N.D.Tex.1980); *See: Peco Inc. v. Hartbauer Tool & Die Co.*, 262 Or. 573, 500 P.2d 708 (1972). It is agreed that the purchase price of this equipment was $120,000.00, that BAT would pay IPC $147,000.00 over five years, that this equipment was ordered, inspected and delivered to BAT, that payments were made to Keydata from IPC only upon BAT's authorization and that this equipment was specially designed for BAT. Security agreements have been found in cases where economic reality would as a practical matter obligate the lessee to pay an amount substantially equal to the fair market value of the equipment, or where the rental price exceeded the market value of the equipment plus what a reasonable interest rate would be for purchasing the equipment on an installment contract. *Rushton v. Shea*, 419 F.Supp. 1349 (Del.1976); *In re Gehrke Enterprises, Inc.*, 1 B.R. 647, (Bkrtcy., W.D.Wis.1979); *Livesey Enterprises v. Smith Management Inc.*, 8 B.R. 346 (Bkrtcy., W.D.Wis.1980).

Here, there is no evidence as to what the option price would be at the end of the lease, however the Court does not find it difficult to conclude that the fair market value will be the value to BAT, and in relation to the original purchase price plus the "rental" or finance charges the value would be nominal.

In view of the fact that this equipment was unique to BAT's purposes, and designed specifically for its use, this court would conclude that the fair market value at the end of the lease term to a third party purchaser would be substantially below the purchase price. BAT would pay no more and probably less than a third party for it is doubtful that IPC would want to incur the expense of removal, shipping, storing and finding another purchaser, if one could be found.

---

**3.** *Eastern Leasing Corp. v. PYE*, 13 B.R. 307 (Bkrtcy., Me.1981).

Where a computer lease provides for an acceleration of rental payments in the event of a default; requires the lessee to bear the entire risk of loss, to insure the computer, and to pay all taxes imposed upon the equipment, and where the equipment was selected by the lessee, was designed specifically for lessee's use and was delivered directly to the lessee, all coupled with the fact that the defendant fashions itself as a "financing lessor" whose only function was to provide funds for the computer and whose principal concern was to be secured adequately in doing so, leads to the conclusion that the lease was one which was "intended for security" and as such was governed by Article 9 of the UCC. *All-States Leasing Co. v. Ochs*, 42 Or.App. 319, 600 P.2d 899, 27 U.C.C.Rep.Serv. 808 (1979).

In accordance with the above findings of fact and conclusions of law, judgment shall enter for the plaintiff/debtor, Keydata Corporation in the amount of $11,203.30 plus court costs and interest.