MINER, Circuit Judge:
 

 Liona Corporation, N.V. (“Liona”) appeals from a judgment of the United States District Court for the Southern District of New York (Tenney, J.) affirming an order of the bankruptcy court (Lifland, J.) in favor of debtor PCH Associates (“PCH”). The District Court held that the sale-leaseback arrangement between Liona and PCH was a joint venture agreement rather than a non-residential lease subject to the provisions of section 365(d)(3), (4) of the Bankruptcy Reform Act of 1978, as amended by the Bankruptcy Amendments and Federal Judgeship Act of 1984, 11 U.S.C. § 365(d)(3), (4) (Supp.III 1985) (“Bankruptcy Code” or “Code”). We affirm the judgment of the district court on the ground that the sale-leaseback arrangement is not an unexpired nonresidential lease within the contemplation of the Code.
 

 BACKGROUND
 

 This dispute centers around the true nature of a transaction that was “sharply tailored by sophisticated parties,”
 
 PCH Associates v. Liona Corporation N.V.,
 
 55 B.R. 273, 274 (Bankr.S.D.N.Y.1985), and was admittedly structured as a sale-leaseback arrangement for tax and investment advantages. PCH, a Pennsylvania limited partnership formed in 1976 and formerly known as Simon Associates (“Simon”), owns and operates the Philadelphia Centre Hotel (“hotel”). Prior to September 1981 and the transaction at issue on this appeal, PCH’s predecessor, Simon, held title to both the hotel and the land upon which it is situated. In 1980, Richard Bernstein, an experienced real estate operator and investor, learned that the hotel was for sale. In addition to existing mortgages and seller-provided financing, he determined that $9,000,000 was needed to acquire, renovate, and provide working capital for the hotel. Bernstein located a group of United States investors willing to supply $4,000,000 as new limited partners of PCH. He then approached Fidinam, a consortium of financial service companies, to place the remaining $5,000,000 investment.
 

 
 *195
 
 Bernstein required a structure that would allocate all the tax benefits of depreciation of the hotel to PCH. Fidinam, in turn, required an investment for its client that would be evidenced by ownership of a tangible asset and would guarantee a 12% fixed annual rate of return, with an additional share contingent on the hotel’s cash flow. Fidinam did not want its client involved in the daily management of the hotel. Upon reaching agreement, the parties’ lawyers structured the transaction to encompass Bernstein’s and Fidinam’s requirements. Ultimately, Liona, a Netherlands Antilles corporation, became the beneficiary of Fidinam’s negotiations.
 

 In September 1981, the requirements of the parties were fulfilled through a “Sale-Leaseback Agreement” and a “Ground Lease” whereby the land owned by PCH, but not the hotel, was sold to Purchase Estates, Ltd. and immediately leased back to PCH.
 
 [1]
 
 Ultimately, the land interest of Purchase Estates, Ltd. was assigned to Li-ona. Thus, Liona held title to the land and leased it to PCH, which owned and managed the hotel.
 

 Section 1.01 of the Ground Lease provided for an initial term of 33 years, renewable for four terms under section 42.01, for a total of 165 years. Rent was set at a minimum annual rate of $600,000 in section 3.01, with a percentage rental based upon a percentage of increases in the hotel’s gross revenues provided in section 3.02. Section 3.04 provided for an adjustment of the annual rent if the “Landlord’s Investment” fell below $5,000,000. In such instance, the annual rent would be reduced to 12% of the “Landlord’s Investment.”
 

 Section 3.10 of the Ground Lease further provided that:
 

 It is understood and agreed that the amount herein provided paid to Landlord in addition to the minimum net annual rental, although based upon a percentage of Tenant’s revenue during each year, is rent, and Landlord shall in no event be construed or held to be a partner or associate of Tenant in the conduct of its business, nor shall Landlord be liable for any debts incurred by Tenant in the conduct of said business or otherwise,
 
 but it is understood and agreed that the relationship between the parties hereto is, and at all times shall remain, that of Landlord and Tenant.
 

 Appellant’s App. at 142 (emphasis supplied).
 

 Article 34 of the Ground Lease also provided that:
 

 This Lease contains all the promises, agreements, conditions, inducements and understandings between Landlord and Tenant relative to the Premises and there are no promises, agreements, conditions, understandings, inducements, warranties or representations, oral or written, expressed or implied, between them other than as set forth herein or in the Contract.
 

 Appellant’s App. at 225.
 

 In November of 1984, PCH filed for reorganization under section 301 of the Bankruptcy Reform Act of 1978. Since that date, PCH has operated the hotel as a debtor-in-possession under sections 1107 and 1108 of the Code. On December 21, 1981, pursuant to section 365(d)(3), (4) of the Code, Liona filed an application with the bankruptcy court seeking an order directing PCH to continue paying rent to Liona according to the terms of the Ground Lease. PCH subsequently instituted an adversary proceeding seeking a declaration that the Ground Lease was not an unexpired nonresidential lease within the scope of section 365(d)(3), (4) of the Code, but rather constituted a joint venture or a subordinate financing scheme.
 

 The bankruptcy court found for PCH, concluding that, even though the transaction was labeled a sale and a lease, the true nature of the arrangement was that of a joint venture and therefore no landlord/tenant relationship existed.
 
 PCH Associates v. Liona Corporation, N.V.,
 
 55 B.R. 273, 283 (Bankr.S.D.N.Y.1985). As a
 
 *196
 
 result, the court held that Liona was not entitled to collect rent from PCH under section 365 of the Code. Relying on Bernstein’s expert testimony, the bankruptcy court pointed to a number of items in the arrangement considered unusual in an actual sale agreement,
 
 [2]
 
 and in a true lease.
 
 [3]
 
 55 B.R. at 276-78. Finding the terms of the contracts ambiguous, the court relied on extrinsic evidence of the parties’ intent in formulating the transaction as a sale and leaseback, also provided by Bernstein in part, to determine the true nature of the transaction. 55 B.R. at 281-83.
 

 The district court affirmed the bankruptcy court’s conclusions, holding that: (1) it was not error to permit parol evidence to clarify the terms of the agreements,
 
 Liona, Corporation, N.V. v. PCH Associates,
 
 60 B.R. 870, 874 (S.D.N.Y.1986); (2) it was not error to permit Bernstein, now president of the general partner of PCH, to testify as to his understanding of the parties’ intentions and as an expert regarding what terms are usual in such agreements,
 
 id.
 
 at 875; and (3) the elements of a joint venture were present,
 
 id.
 
 at 876-78.
 

 Liona appeals from the district court’s affirmance of the bankruptcy court’s order.
 

 DISCUSSION
 

 Two issues are presented on this appeal: First, whether the bankruptcy and district courts, under Pennsylvania law, properly considered parol evidence of the parties’ intent to determine the true nature of the documents, and second, whether the Ground Lease is a lease within the meaning of section 365(d)(3), (4) of the Bankruptcy Code.
 

 I.
 
 Parol Evidence
 

 As recognized by both the district court and the bankruptcy court, and as agreed by
 
 *197
 
 the parties, Pennsylvania law controls the question of the admissibility of parol evidence. Pennsylvania law permits the use of parol evidence to explain the parties’ intent when the true nature of the contract is at issue or when the contract is ambiguous.
 
 Waldman v. Shoemaker,
 
 367 Pa. 587, 591, 80 A.2d 776, 777 (1951);
 
 Biddle v. Biddle,
 
 363 Pa. 426, 429-30, 70 A.2d 281, 283 (1950);
 
 Howell v. Wheelock,
 
 115 Pa.Super. 599, 602-03, 176 A. 252, 253 (1934).
 

 The bankruptcy judge concluded that the Sale-Leaseback Agreement and the Ground Lease were ambiguous because they were reasonably susceptible to more than one interpretation. 55 B.R. at 280. Liona counters that the form in which the parties chose to construct their agreement is controlling and therefore no ambiguity existed. However, the district court disposed of this argument because it found a conflict between the caption and form of the Ground Lease and Sale-Leaseback Agreement, and the provisions contained within those contracts. Merely by labeling a transaction a “lease,” when its contents spoke of some other transaction, did not remove all ambiguity.
 
 [4]
 
 60 B.R. at 874. Thus, the district court concluded that extrinsic evidence was properly admitted to clarify what exactly the parties intended to create.
 

 The district court was correct in looking beyond the form of the Sale-Leaseback Agreement and Ground Lease for clarification of the true nature of the transaction. The documents specified that the relationship between Liona and PCH was that of landlord/tenant and provided that the documents represented the entire agreement of the parties. However, the terms of the agreements, i.e., the percentage rent provision, Liona’s option to become a 50% equity partner, and the numerous controls given to Liona, conflict with the titles placed on the instruments. Consequently, we are not bound to the four corners of the documents merely because they purport to be a sale and lease, when the contents of the documents indicate a different transaction. It is precisely this ambiguity in the
 
 terms
 
 of the contract that requires the admission of parol evidence to determine the true intent of the parties in entering into the transaction.
 

 We find Liona’s contention that the title of the documents should control without merit. Under Pennsylvania law, the caption of a document does not control its legal effect.
 
 See, e.g., Kowatch v. Atlantic Richfield Co.,
 
 480 Pa. 388, 391, 390 A.2d 747, 749 (1978) (citing
 
 Atlantic Richfield Co. v. Razumic,
 
 480 Pa. 366, 390 A.2d 736 (1978)) (a writing captioned to suggest a landlord/tenant relationship held to embody a franchise agreement);
 
 Nath v. National Equipment Leasing Corp.,
 
 282 Pa. Super. 142, 153-54, 422 A.2d 868, 873-75 (1980) (an instrument entitled “lease” held to be a security agreement),
 
 aff'd,
 
 497 Pa. 126, 439 A.2d 633 (1981). Neither does a contractual provision stating the relationship of the parties bar a court from determining the character of the instrument. In
 
 Nath v. National Equipment,
 
 282 Pa.Super. at 152, 422 A.2d at 873-75, a provision similar to that found in section 3.10 of the Ground Lease purported to set forth the parties’ relationship. The court ruled that extrinsic evidence concerning the circumstances surrounding the transaction was admissible nonetheless.
 

 Liona asserts that, under Pennsylvania precedent, contracting parties who agree on the legal status of their relationship are bound by that expression of intent.
 
 Kingsley Clothing Manufacturing Co. v. Jacobs,
 
 344 Pa. 551, 555, 26 A.2d 315, 317 (1942);
 
 Rosenberger v. Herbst,
 
 210 Pa.Super. 127, 131, 232 A.2d 634, 636 (1967). Both
 
 Kings-ley
 
 and
 
 Rosenberger
 
 addressed contractual
 
 *198
 
 provisions declaring that the parties did not intend to form a partnership relationship. In both cases, however, the terms of the contracts were not otherwise ambiguous. Furthermore, the Pennsylvania courts recognized merely that the parties could bind themselves
 
 inter se.
 
 While the parties to a contract may intend that, between themselves, their relationship is to be governed by the label they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties’ agreement. This is especially so under the statutory scheme controlling bankruptcy proceedings, where Congress has defined the legal consequences of commercial relationships. Moreover, it would be inherently inequitable to allow the parties’ choice of label to affect the rights of third party creditors. Accordingly, we find the cases cited by Liona distinguishable.
 

 Because we find no error in the determination that the documents at issue are ambiguous, under Pennsylvania law, parol evidence as to the circumstances of the negotiations was properly admitted to ascertain the intentions of the parties.
 

 We note that, even apart from the propriety of admitting parol evidence here to clarify ambiguity, it was not error to look behind the form of the agreements to the economic substance of the transactions. As discussed below, the legislative history of section 502(b)(6) of the Code mandates that a court look beyond mere form to the circumstances of each case, including the economic substance of the transaction, to determine whether a “true lease” exists for purposes of the Code.
 
 See
 
 S.Rep. No. 989, 95th Cong., 2d Sess. 64,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 5850. Furthermore, as was noted in
 
 Sun Oil Co. v. Commissioner,
 
 562 F.2d 258, 263 (3d Cir.1977), “[w]e look to the economic realities of the lease and not to the labels applied by the parties” to determine the true nature of a transaction.
 
 See Nath v. National Equipment Leasing Corp.,
 
 282 Pa.Super. 142, 153 n. 8, 422 A.2d 868, 873 n. 8 (1980),
 
 aff'd,
 
 497 Pa. 126, 439 A.2d 633 (1981);
 
 In re Keydata Corp.,
 
 18 B.R. 907, 909 (Bankr.D.Mass.1982).
 

 Finally, Bernstein’s testimony as a real estate expert was not erroneously admitted by the bankruptcy court, due to the wide discretion afforded a trial court in determining whether expert testimony should be admitted or excluded.
 
 See Salem v. United States Lines Co.,
 
 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962).
 

 II.
 
 Application of Section 365(d)(3), (4)
 

 Liona initiated this action to compel PCH to perform its obligations under the Ground Lease pursuant to section 365(d)(3), (4)of the Bankruptcy Code, which requires a debtor either to affirm or reject “an unexpired lease of nonresidential real property.” The determination of whether this provision applies to the Ground Lease is of critical concern in this bankruptcy proceeding because, if applied, PCH would be forced either to affirm the lease, cure all defects, and perform under the terms of the contract, or to reject the lease and vacate the property. If PCH rejected the lease and vacated the property, there likely would be no assets left to administer. If PCH affirmed the lease, a substantial burden would be placed on the reorganization proceeding. Therefore, PCH adamantly asserts that there was no true sale and no true lease for the purposes of section 365, and that it therefore has no obligation to affirm or reject the lease. Specifically, PCH asserts that the documents merely provide the means by which the investment goals and tax requirements of the parties could be fulfilled.
 

 Both the bankruptcy court and the district court held that because the contracts contemplated a joint venture, the Ground Lease was not a lease. Although we agree with the determination that the Ground Lease is not a lease, our analysis is somewhat different. We interpret section 365(d)(3), (4) of the Bankruptcy Code to apply solely to a “true” or “bona fide” lease. The Ground Lease is not, in our opinion, a true lease as contemplated there
 
 *199
 
 in and we find that determination disposi-tive of the case. It is unnecessary, therefore, to identify the transaction as a joint venture, security agreement, subordinated financing, or other investment scheme. Suffice it to say that it is not a bona fide lease for purposes of the Bankruptcy Code.
 

 Section 365(d) requires “any unexpired lease of nonresidential real property” to be treated as follows:
 

 (3) The trustee shall timely perform all the obligations of the debtor, ... under any unexpired lease of nonresidential real property, until such lease is assumed or rejected....
 

 (4) [I]f the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, ... then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.
 

 11 U.S.C. § 365(d)(3), (4) (Supp.III 1985). These subsections were added to the Bankruptcy Code in 1984 to provide a 60-day period in which a lease of real property must be assumed or rejected, and to require continued performance under a lease until the decision to assume or reject is made. Statement by Senator Orrin G. Hatch, on House Conference Report No. 98-882, June 29, 1984,
 
 reprinted in
 
 1984 U.S.Code Cong. & Ad.News 590, 598-99.
 
 See generally 2 Collier on Bankruptcy
 
 (15th ed. 1986) ¶ 365.03[2], at 365-30 to 365-31.
 

 Although the legislative history provides us with the purpose of these subsections, there is little evidence available to assist us in determining what Congress envisioned by the term “lease of nonresidential real property.” The statute’s plain language offers little definition of those transactions that must be assumed or rejected, other than in section 365(m), which provides that “leases of real property shall include any rental agreement to use real property.” The term “lease of real property” does, however, appear elsewhere in the Code, in section 502(b)(6). The legislative history of section 502(b)(6) furnishes explicit authority for restricting the scope of that term to “bona fide” leases.
 

 Section 502(b)(6) limits the amount of damages that a landlord can recover upon breach or rejection of a lease of real property. “It was designed to compensate the landlord for his loss while not permitting a claim so large (based on a long-term lease) as to prevent other general unsecured creditors from recovering_” S.Rep. No. 989, 95th Cong., 2d Sess. 63,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 5849;
 
 see also
 
 H.R.Rep. No. 595, 95th Cong., 2d Sess. 353,
 
 reprinted in
 
 1978 U.S. Code Cong. & Ad.News 5963, 6309; 3
 
 Collier on Bankruptcy
 
 (15th ed. 1986) 1f 502.-02[7], at 502-54. The
 
 Senate Report
 
 notes that the phrase “lease of real property” does not apply to lease financing transactions or to leases intended as security, but rather applies only to a “true” or “bona fide” lease. Thus, where the purported “lease” involves merely a sale of the real estate and the rental payments are, in truth, payments of principal and interest on a secured loan involving a sale of real estate, there is no true lease and section 502(b)(6) does not apply. S.Rep. No. 989, 95th Cong., 2d Sess. 64,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 5850;
 
 see
 
 3
 
 Collier on Bankruptcy
 
 (15th ed. 1986) 11 502.02[7][d], at 502-63 to 502-64.
 

 Furthermore, the bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than “the locus of title, the form of the transaction or the fact that the transaction is denominated as a ‘lease,’ ” to determine whether the transaction embodies a “true lease” or a financing transaction. S.Rep. No. 989, 95th Cong., 2d Sess. 64,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 5850.
 

 We have no difficulty applying the section 502(b)(6) requirement of a bona fide lease to section 365(d)(3), (4) because these sections, read together, are part of a total scheme designed to set forth the rights and obligations of landlords and tenants involved in bankruptcy proceedings.
 
 See In
 
 
 *200
 

 re Theatre Holding Corp.,
 
 22 B.R. 884, 886 (Bankr.S.D.N.Y.1982); 2
 
 Collier on Bankruptcy
 
 (15th ed. 1986) II 365.02[1], at 365-15. When a debtor-tenant rejects a lease pursuant to section 365(d)(3), (4), that rejection constitutes a breach of the lease under section 365(g), and brings section 502(b)(6) into effect.
 
 See
 
 2
 
 Collier on Bankruptcy
 
 (15th ed. 1986) ¶ 365.08, at 365-50. Section 502(b)(6) limits a landlord’s claim for unpaid rent to three years of future rent, plus any unpaid rent, upon breach of the lease. Moreover, section 365, as applied by bankruptcy courts, incorporates the requirement that leases failing to meet the “bona fide” definition are not to be treated as leases for purposes of the Bankruptcy Code.
 
 See In re Independence Village,
 
 52 B.R. 715 (Bankr.N.D.Mich.1985);
 
 In re Berge,
 
 32 B.R. 370 (Bankr.D.Wis.1983);
 
 In re H & S Manufacturing Inc.,
 
 13 B.R. 692 (Bankr.E.D.N.Y.1981); 2
 
 Collier on Bankruptcy
 
 (15th ed. 1986) ¶ 365.03[2], at 365-31.
 

 We believe that reading a requirement of a true lease into section 365 is necessary to effectuate the purposes of that section. As a whole, section 365 allows a trustee, or in this case a debtor-in-possession, to reject or assume executory contracts and leases, based on a determination of whether they burden or benefit the bankrupt estate. Thus, executory contracts and leases that benefit the bankrupt are favored over contracts with other creditors. If security transactions, loans and other financing arrangements can be couched in lease terms, and can thereby be assumed by the bankrupt estate, the “lessor” gains a distinct advantage at the expense of other creditors without a concomitant benefit to the bankrupt estate. This is especially apparent in the case at bar. If successful, Liona would enjoy the benefit of its contract with PCH to the detriment of others having valid claims against the bankrupt’s estate. However, if there is no true lease, Liona should not be permitted to escape the consequences of investor/creditor status by invoking the labels of “landlord” and “lease.”
 

 Satisfied that section 365(d)(3), (4) requires a bona fide lease, we must now determine whether the transaction at issue embodied such a lease, keeping in mind the economic substance of the transaction and not its form.
 

 While there is a “strong presumption that a deed and lease ... are what they purport to be,”
 
 Fox v. Peck Iron & Metal Co.,
 
 25 B.R. 674, 688 (Bankr.S.D.Cal.1982), here there was substantial evidence upon which the bankruptcy court and the district court could rely to find that the transaction is something other than a true lease. Based on the circumstances of the negotiations and the economic substance of the transaction, it was not error to conclude that the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship.
 

 We are faced with a transaction cast as a sale/leaseback arrangement, a “relatively modern, and clever, structure of financing which affords significant advantages to both purchaser-lessor and seller-lessee.”
 
 Id.
 
 at 688. Bernstein, acting for PCH, sought out Liona in order to pool their resources for their mutual benefit. The transaction was structured as a ground lease to accomplish a trade-off between tax benefits for PCH and a higher guaranteed return, without management concerns, for Liona. Therefore, rent was not calculated to compensate Liona for the use of the property; rather the parties structured the “rent” solely to ensure Liona’s return on its investment. Furthermore, the “purchase price” paid by Liona for the land was not based on market rate, but was calculated as the amount necessary to finance the transaction.
 

 It seems clear that no true lease was contemplated by the parties here. It is undisputed that Bernstein, acting for PCH, initiated the entire transaction, including the purchase of the land by Liona. In
 
 In re Winston Mills, Inc.,
 
 6 B.R. 587, 598 (Bankr.S.D.N.Y.1980), the court stated that the fact that property is “purchased by the lessor specifically for the lessee’s use”
 
 *201
 
 tends to prove that no true lease exists.
 
 See also In re Keydata Corp.,
 
 18 B.R. 907, 909 (Bankr.D.Mass.1982) (no true lease where lessee “selected, inspected, contracted for, and received” the property). In
 
 Fox v. Peck Iron & Metal Co.,
 
 25 B.R. 674, 681, 690 (Bankr.S.D.Cal.1982), the court found no true lease where the “lessee” had originally requested a loan and the transaction was structured as a lease solely to secure tax advantages.
 

 Another factor indicating that this transaction does not involve a true lease is that the purchase price was not related to the value of the land. A large inequality or discrepancy in values has been characterized as a “strong circumstance” tending to show that a transaction was a disguised financing scheme.
 
 Id.
 
 at 689;
 
 see also In re 716 Third Avenue Holding Corp.,
 
 340 F.2d 42, 47 (2d Cir.1964),
 
 cert. denied,
 
 381 U.S. 913, 85 S.Ct. 1535, 14 L.Ed.2d 434 (1965). Furthermore, PCH assumed many of the obligations associated with outright ownership of the property, including responsibility for paying property taxes and insurance. As noted in the
 
 Senate Report
 
 on section 502(b)(6) of the Bankruptcy Code:
 

 [T]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property.
 
 See, e.g., Financial Accounting Standards Board Statement No. 13 and SEC Reg. S-X,
 
 17 C.F.R. section 210.3-16(g) (1977);
 
 cf. First National Bank of Chicago v. Irving Trust Co.,
 
 74 F.2d 263 (2d Cir.1934); and Albenda and Lief, ‘Net Lease Financing Transactions Under the Proposed Bankruptcy Act of 1973,’ 30 Business Lawyer 713 (1975).
 

 S.Rep. No. 598, 95th Cong., 2d Sess. 64,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad. News 5787, 5850. Therefore, we find that PCH’s significant indicia of ownership tend toward a finding that there is no true lease. Additionally, the provisions allowing Liona to recover its investment if the hotel were refinanced, and giving PCH the power to pre-pay Liona’s investment, at which time Liona would share solely in profits, strongly suggest a transaction other than a lease.
 

 Mindful that the structure of the transaction was based on the tax considerations and the investment requirements of both parties, and viewing the transaction as a whole, we hold that the Ground Lease and Sale-Leaseback Agreement do not constitute a true lease. Therefore section 365(d)(3), (4) of the Bankruptcy Code has no application here. Whether these contracts create a joint venture, a security agreement, or some other form of investment vehicle need not be decided here.
 

 CONCLUSION
 

 To summarize: We affirm the district court’s ruling that parol evidence and Bernstein’s expert testimony were admissible. We also affirm the judgment below insofar as it holds that section 365(d)(3), (4) does not apply to the transaction at issue. We do not reach the issue of whether the Ground Lease and Sale-Leaseback Agreement create a joint venture.
 

 [1]
 

 . A full description of the transaction, the parties involved and their relationship is set forth in the bankruptcy court’s decision.
 
 See
 
 55 B.R. at 274-75.
 

 [2]
 

 . Specifically, the court noted that the following items were unusual in an actual sale agreement:
 

 1. Liona’s investment of $5,000,000 constituted 5/9ths of the total price for the acquisition, renovation and operation of the hotel.
 

 2. The amount of Liona’s investment was not related to the value of the land.
 

 3. Liona used the predetermined return on the investment in the hotel, not the value of the property, to evaluate the value assigned to the land for purposes of the sale-leaseback transaction.
 

 4. Article 4 and Article 10 of an earlier agreement mandated that Bernstein be a general partner at the time the deal was closed.
 

 5. Section 7 of that earlier agreement required Liona to put up one-half of the amount required to repay a pre-existing mortgage on the land and building.
 

 6. Transfer taxes, title insurance premiums and closing adjustments were either applied toward renovation of the hotel or shared
 
 5A
 
 ths to Liona and Vfths to PCH.
 

 55 B.R. at 276-77.
 

 [3]
 

 . The court found that the following features were unusual in a lease:
 

 1. PCH solicited Liona to invest in PCH’s property.
 

 2. While the initial term was 33 years, it could be extended to 165 years, an unusually long term for a true lease.
 

 3. Liona could not recognize any benefit from appreciation in the value of the land because the agreement provides for a fixed rent during the term of the agreement.
 

 4. The fixed rent bore no relationship to the market value of the land; rather, it was strictly the result of trading tax benefits for a higher return from the joint venture.
 

 5. Liona would at all times receive a 12% rate of return on its investment.
 

 6. PCH had the option to prepay the “Landlord’s Investment,” thereby terminating its obligation to pay any fixed rent.
 

 7. Condemnation awards were apportioned 5/9ths to Liona and 4/9ths to PCH, rather than according to the relative value of the land and the building, or according to the unexpired portion of the lease term.
 

 8. Liona’s position was subordinated to all existing mortgages on the land and hotel, to all renewals, modifications and extensions thereof, and to certain future financing.
 

 9. Liona, under certain circumstances, shared equally in the benefits of PCH’s savings of debt service costs, if any, and would be subject to the detriments of increased debt service costs, if any. Either Liona or PCH could arrange the refinancing that would trigger these provisions.
 

 10. A great deal of control over the hotel operations would shift to Liona depending upon whether Bernstein maintained a controlling influence over PCH.
 

 11. Both parties had an option to purchase the other's interest if either party received a bona fide offer from a third party.
 

 12. After the repayment of the "Landlord’s Investment,” Liona would share in the net cash flow of the hotel on an equal basis with PCH.
 

 55 B.R. at 277-78.
 

 [4]
 

 . The district court colorfully stated this point:
 

 If two parties draw a picture of an animal that has four legs and a tail, and the parties agree to label it "A Horse,” it would be reasonable to conclude that the picture is in fact a drawing of a horse. If, however, the animal ■ not only has four legs and a tail, but also has large floppy ears and a long trunk in place of a nose, then it would be unclear whether the parties actually intended to draw a horse or whether they meant to draw something else— i.e., an elephant.
 

 60 B.R. at 874.