In re PITTSBURGH SPORTS ASSOCI-
ATES HOLDING COMPANY, Pitts-
burgh Hockey Associates, HBRM,
LLC, Debtors.

Bankruptcy Nos. 98–28174BM
to 98–28176BM.

United States Bankruptcy Court,
W.D. Pennsylvania.

June 18, 1999.

## *MEMORANDUM OPINION*

BERNARD MARKOVITZ, Bankruptcy Judge.

### FINDINGS OF FACT

Debtor Pittsburgh Hockey Associates ("PHA") owns and operates a National Hockey League ("NHL") franchise known as the Pittsburgh Penguins, which since its inception has played all of its home games in the Civic Arena in Pittsburgh, Pennsylvania.

Respondent Public Auditorium Authority ("PAA") constructed the Civic Arena and is the ultimate Lessor of the land on which it is located and of adjacent land.

Respondent SMG Pittsburgh presently leases the Civic Arena and adjacent land from PAA and has entered into an agreement with PHA whereby the Penguins play all home games at the Civic Arena.

All the assets of the Penguins, including the lease for the Civic Arena and adjacent land, were owned and controlled prior to 1991 by Edward J. DeBartolo Corporation ("DeBartolo") or by corporations it owned or controlled. Civic Arena Corporation ("CAC") had entered into a sublease with PAA whereby CAC subleased the Civic Arena and land on which it was situated. DeBartolo Century Corporation ("DCC") had entered into a sublease with PAA whereby DCC subleased the land adjacent to the Civic Arena.

Under these leases, CAC and DCC paid annual rents to PAA in the amount of $350,000 plus another $250,000 for use of the ice rink for practices. The total rent they paid to PAA on an annual basis was $600,000.

DeBartolo decided in 1991 to divest itself of some of its assets and put the Penguins up for sale. Its asking price for the assets of the franchise was $65,000,000.

DeBartolo engaged one Howard Baldwin to act as its agent and to find prospective buyers of the franchise and its assets. Although Baldwin had located several prospective purchasers, none was able to consummate a sale. At that point Baldwin informed DeBartolo that a group of investors he led wanted to purchase the Penguins and related assets.

Baldwin, however, was not able to meet the $65,000,000 asking price established by DeBartolo. He still needed to come up with approximately $29,000,000 in additional funds.

In an attempt to obtain additional capital, Baldwin approached one Edward Snider, who already was a principal owner of another NHL franchise. He also approached Spectacor Management, in which Snider had a substantial interest.

NHL rules prohibited Snider from purchasing more than a five percent interest in the Penguins because of his substantial ownership interest in another NHL franchise. Its rules also prevented Snider from lending enough money to Baldwin to

enable Baldwin to consummate a purchase of the Penguins.

As a way of masking Snider's participation in the transaction and making it palatable to the NHL, Snider and others created respondent SMG Pittsburgh, which in turn provided Baldwin with $24,-000,000 so that Baldwin could purchase the Penguins. The remaining $5,000,000 needed to purchase the Penguins was taken care of when DeBartolo agreed to accept deferred payments in this amount from future advertising and playoff revenues and expansion fees.

Baldwin and his group of investors purchased the Penguins from DeBartolo on October 31, 1991 through a complex series of transactions. The assets of the franchise were contributed by the DeBartolo corporations to a partnership known as PBT Business Trust ("PBT"), another DeBartolo entity. PBT then transferred its interest in the NHL franchise known as the Penguins to the group of investors led by Baldwin who were known as PHA.

Among the documents executed in connection with the sale of the Penguins was an agreement between CAC and SMG, whereby SMG acquired CAC's rights to the Civic Arena under CAC's sublease with PAA. SMG then purported to sublease the Civic Arena to PBT, which in turn transferred its interest in the Penguins and in this purported sublease to PHA.

Among other things, the agreement between PBT and SMG specified that the agreement would expire on September 1, 2012, "unless terminated earlier".

The agreement between SMG and PBT also provided that, under certain conditions, SMG had the right to relocate the Penguins to a venue other than the Civic Arena. If SMG elected not to renew the CAC lease with PAA and did not itself select a new venue for the Penguins, the Penguins had the option of relocating to another venue, **but only if the Penguins maintained SMG's position vis-a-vis the Penguins until the year 2012.** Should this occur, the Penguins had an obligation to require the landlord of the alternative venue to enter into an agreement with SMG, who then would enter into an agreement with PHA on terms substantially similar to those providing for PHA's occupancy of the Civic Arena.

Yet another document prepared in connection with Baldwin's acquisition of the Penguins was a security agreement between PBT, the predecessor of PHA, and SMG, whereby the obligations of PBT/PHA to SMG were protected by a security interest in basically all the assets of the Penguins. Despite repeated demands by SMG that it do so, PBT/PHA never executed the agreement.

The agreement between SMG and PHA, as amended and restated, provides for payment of a base rent in accordance with a specified formula. It also obligates PHA to pay SMG all event costs for staging hockey games at the Civic Arena and to pay an adjusted base rent for regularly-scheduled home games that are televised within a fifty-mile radius of the Civic Arena.

The amended and restated agreement also entitles SMG to a specified dollar amount of gross revenues derived from suites in existence prior to the 1993–94 hockey season and to specified percentages of gross revenues derived from various seats and suites constructed in 1993–94. SMG also retains 92.5% of revenues derived from sales of programs and novelties and retains 100% of parking revenues through October 31, 2001, after which it will retain only 60%. It also receives a specified percentage of advertising revenues.

With the exception of those NHL franchises which play their home games in a arena under an agreement with an entity affiliated with the franchise, the cost to PHA of playing its home games is the highest in the NHL and exceeds its nearest competitor by more than twenty-five

percent. If player salaries are excluded, PHA's costs are the highest in the NHL as a percentage of costs other than player salaries.

PHA derives no income from non-hockey events staged at the Civic Arena. Moreover, it is required to compensate SMG for revenues SMG loses at non-hockey events due to reduced seating capacity as a result of improvements to the Civic Arena made in 1997.

PHA presently pays SMG between six million and seven million dollar annually for playing its home games at the Civic Arena, an increase of one thousand percent over the annual rents previously paid by CAC and DCC to PHA. It also is obligated to pay for recent improvements made to the Civic Arena. SMG, which purports to lease the facility to PHA, is 'not required to pay anything for the improvements. The total annual amount PHA pays for using the Civic Arena and for recent improvements made thereto exceeds ten million dollars.

PHA has suffered losses exceeding $50,000,000 over the past three hockey seasons. During this same period, payments made by PHA to SMG and for improvements to the Civic Arena exceed $30,000,000. Payments to SMG alone during this period approximate $20,000,000.

PHA filed a voluntary chapter 11 petition on October 13, 1998. It indicated in its schedules that it had an unexpired lease with SMG for use of the Civic Arena.

Three different plans of reorganization, none of which has yet been confirmed, were filed in this bankruptcy case. After PHA indicated that it would not file a plan of its own, a group led by former Penguins player Mario Lemieux submitted a plan in March of 1999. The NHL submitted a plan in April of 1999. SMG and Fox Sports Net Pittsburgh, which has local television rights to Penguins games, submitted yet a third plan. Hearing on possible confirmation of one of these plans is scheduled for Thursday, June 24, 1999.

On May 26, 1999, PHA brought the present motion to reject in accordance with 11 U.S.C. § 365(a) the above agreement for use of the Civic Arena or, in the alternative, to determine that the agreement is not a "true" lease.

An evidentiary hearing on PHA's motion to reject the agreement was conducted on June 4, 1999. We issued an oral order at the conclusion of said hearing granting its motion to reject the agreement. A written codification of that oral order was subsequently transmitted to the parties in interest bound by the oral order.

An evidentiary hearing on PHA's motion to determine that its agreement with SMG for use of the Civic Arena is not a "true" lease but a disguised financing agreement instead was conducted on June 7, 1999.

The purpose of this memorandum opinion is to more fully explain the basis for our oral order issued on June 4, 1999, and to determine whether the amended and restated agreement between PHA and SMG constitutes a "true" lease.

### PREAMBLE

Initially it must be said that we do not wish to encourage a litigant to characterize a transaction in one manner one day and thereafter revise diametrically the legal description. If such conduct merits a judicial response, it can be provided at an appropriate time. That being said, we find that PHA has not made a judicial admission that its agreement with SMG qualifies as a "true" lease, nor do we find that debtor's actions merit invoking the doctrine of judicial estoppel. Court documents, exhibits, and testimony evidence an intent to camouflage a financing agreement into a lease structure. To the extent that the agreement is a "true" lease, we alternatively conclude that PHA may reject it.

### DISCUSSION

**I. Is PHA Estopped From Seeking A Determination That Its Agreement With SMG Is Not A True Lease?**

PHA identified its agreement with SMG as an unexpired lease of real property in

its bankruptcy schedules. It did the same in various motions brought previously in this bankruptcy case and in Adversary No. 98–2053–BM, wherein we enforced certain non-relocation covenants contained in agreements between PHA and SMG and between PHA and PAA.

According to SMG, these representations by PHA estop PHA from now asserting that its agreement with SMG is not a "true" lease. Such representations, SMG contends, qualify as binding judicial admissions and are conclusive with regard to the "true" nature of the agreement. SMG further maintains that PHA's earlier assertions concerning its lease with SMG are inconsistent with PHA's present position and that PHA therefore is judicially estopped from denying that its agreement with SMG is a "true" lease.

### A. *Judicial Admissions.*

■ A judicial admission is an admission made by a party in pleadings, stipulations, and the like, and do not have to be proven in the litigation in which they are made. *Giannone v. United States Steel Corp.*, 238 F.2d 544, 547 (3rd Cir.1956). It is binding upon the party making the admission for purposes of the case in which made, provided that said admission is unequivocal. *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir.1972).

■ Judicial admissions are restricted in scope to matters of fact which otherwise would require evidentiary proof. *Id.* A legal conclusion—e.g., that a party was negligent or caused an injury—does not qualify's a judicial admission. *Giannone*, 238 F.2d at 547; *MacDonald v. General Motors Corp.*, 110 F.3d 337, 341 (6th Cir. 1997) (*citations omitted*).

PHA's numerous previous representations during this bankruptcy case that its agreement with SMG is a lease is not a binding judicial admission for at least two reasons.

■ For purposes of the present motion, the proposition that the agreement between PHA and SMG is (or is not) a "true" lease is a conclusion of law no less than the proposition that, say, an individual was negligent or committed perjury. In the present context it does not constitute a statement of fact. Conclusions of law, we have seen, do not lie within the scope of the doctrine of judicial admission. They must be proven in a contested matter.

The contention that PHA's previous assertions constitute binding judicial admissions fails also because they were **not** made "in the same litigation" as is now before us. *Giannone*, 238 F.2d at 547.

■ Many of the representations by PHA that it had a lease with SMG were made to banks, on its tax returns, in audited financial statements, and to members of the press and electronic media. They were not made in a **judicial** context and therefore do not qualify as admissions.

■ As for those statements PHA made in various other motions brought in this bankruptcy case or in adversary actions brought under it, they were not made in the requisite sense "in the same litigation".

*Giannone* was a personal injury tort action brought under state law in federal court. It did not involve a bankruptcy case, which is vastly different from a garden-variety personal injury case. What qualifies as the "same litigation" for purposes of a garden-variety personal injury action is not the same as what constitutes such in a bankruptcy case. A motion for relief from the automatic stay, for instance, is not the "same litigation" as a motion for approval of counsel fees or an adversary action objecting to discharge even though all are brought within the confines of a single bankruptcy case.

### B. *Judicial Estoppel.*

■ SMG alternatively argues that PHA is judicially estopped from now maintaining that the above agreement with SMG is not a "true" lease because of previous statements by PHA in the above bank-

ruptcy case that it was a "lease". This argument fares no better than does SMG's previous argument concerning judicial admissions. Debtor is not judicially estopped from asserting in its present motion that its agreement with SMG really is not a lease and from seeking a determination to that effect.

 Judicial estoppel is a judge-made doctrine which prevents a litigant from asserting a position that is inconsistent with a position that litigant had asserted in the same or in a previous proceeding. *Ryan Operations v. Santiam–Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir.1996). It was created to prevent a litigant from playing "fast and loose" with the court. *McCarron v. F.D.I.C.*, 111 F.3d 1089, 1097 (3d Cir.1997).

 It involves the relationships between a given litigant and the judicial system as a whole. *Delgrosso v. Spang & Co.*, 903 F.2d 234, 241 (3d Cir.1990). Its primary purpose is to protect the integrity of the judicial system, not to protect other parties to the litigation. *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121–22 (3d Cir.1992).

 There is no bright-line test for determining whether the doctrine applies in a particular instance. Its application requires consideration of facts and circumstances specific to that particular case. *Scarano v. Central Railroad Co. of New Jersey*, 203 F.2d 510, 513 (3d Cir.1953).

 Judicial estoppel is an appropriate remedy when: (1) the litigants' present position is inconsistent with a position it previously had asserted; and (2) the litigant asserted either (or both) of the inconsistent positions in bad faith—i.e., with intention to play "fast and loose" with the court. *Ryan Operations*, 81 F.3d at 361.

 The person invoking the doctrine of judicial estoppel need not be the same adversary as the one against whom the previous inconsistent position was asserted. *Ryan Operations*, 81 F.3d at 359.

Furthermore, the litigant whom they seek to estop need not have benefitted from its previous inconsistent position. *Id.*

 Judicial estoppel is not intended to eliminate all inconsistencies, however slight or inadvertent; it is concerned only with deterring inconsistencies which are of such a magnitude as to lead one to conclude that a litigant is playing "fast and loose" with the court. *Ryan Operations*, 81 F.3d at 358.

Although PHA unquestionably represented on numerous occasions in previous proceedings occurring within the perimeters of this bankruptcy case that its agreement with SMG was a lease, we are not willing to conclude that these representations are "inconsistent", for purposes of judicial estoppel, with its present position that said agreement really is not a lease after all.

When PHA made these previous representations, the question whether the agreement "truly" was a lease or a lease in name only was not at issue. That questions was not "on the table", as it now is. PHA, in other words, did not previously assert the position that the agreement with SMG "truly" was a lease, as opposed to a lease in name only, when it previously so characterized the agreement with SMG.

 To the extent that these previous representations are inconsistent with PHA's present assertion, they would have to qualify as a "position" which PHA "urged upon" or "argued before" the court for judicial estoppel to apply. *Cheripka v. Republic Insurance Co. (In re Cheripka)*, 1991 WL 276289 (3rd Cir.1991). When it previously represented in this bankruptcy case that it had a lease with SMG, PHA was not asserting a "position" which it was "urging upon" or "arguing before" the court.

The matter does not end there. Judicial estoppel also does not apply because we see nothing that would justify the inference that PHA's present position that its

agreement with SMG is not truly a lease is asserted in bad faith—i.e., for the purpose of playing "fast and loose" with the court.

PHA brought the motion presently under consideration on May 26, 1999, shortly after SMG and Fox Sports had submitted their own plan of reorganization. It was approximately one month before a hearing on which of the competing plans of reorganization were scheduled to be heard. SMG's argument, as we understand it, maintains that PHA now seeks a determination that its agreement with SMG is really not a lease for the purpose of preventing confirmation of SMG's proposed plan. Such an outcome, SMG continues, will increase the likelihood that the Lemieux plan will be accepted by voting creditors and then confirmed. This result, it insists, would inure to the benefit of PHA's present principals. We reject SMG's argument for at least two reasons.

We are not persuaded that PHA brought the present motion when it did because it intended to scuttle the plan proposed by SMG and Fox Sports. It is just as likely, based on the evidence presented, that PHA brought the present motion when it did—i.e., shortly after the Penguins were eliminated from contention for the Stanley Cup—because it wanted to avoid an anticipated reduction in the sale of playoff tickets. Filing the motion while the playoffs were still in contention, PHA reasoned, would erode fan support for the Penguins.

Even if SMG is correct in asserting that PHA brought the present motion when it did for the purpose of having the Lemieux plan confirmed over the plan submitted by SMG and Fox Sports, this does not constitute the sort of bad faith required for judicial estoppel to apply. Judicial estoppel, we previously noted, was created to protect the integrity of the judicial system and was not meant to protect the litigants. Any harm to SMG that may (or may not) occur to SMG as a result of PHA's present motion does not trigger application in this instance of the doctrine of judicial estoppel.

Having determined that PHA is not estopped from seeking a determination that its agreement with SMG is not a "true" lease, we next shall address the merits of PHA's position.

## C. Is The Agreement Between PHA And SMG A "True" Lease?

To make this determination we must consult Pennsylvania law.

The caption of a document does not determine its legal effect. *Kowatch v. Atlantic Richfield Co.*, 480 Pa. 388, 391, 390 A.2d 747, 749 (1978). For instance, a caption indicating creation of a landlord-tenant relationship is not necessarily dispositive in that regard. *Nath v. National Equipment Leasing Corp.*, 282 Pa.Super. 142, 153–54, 422 A.2d 868, 873–75 (1980), *aff'd*, 497 Pa. 126, 439 A.2d 633 (1981). On the other hand, it is not necessary that the agreement contain the word "lease" for it to be one, provided that the requisites for a lease are present. *Morrisville Shopping Center v. Sun Ray Drug Co.*, 381 Pa. 576, 582–83, 112 A.2d 183, 186–87 (1955).

It is difficult, if not impossible, to formulate an all-encompassing definition of "lease". It may, however, be accurately defined as:

> ... a conveyance or grant or demise of certain described land or tenement (usually in consideration of rent or other recompense) for a prescribed period .... but for a less time than the lessor hath in the premises.

*Morrisville Shopping Center*, 381 Pa. at 582, 112 A.2d at 186.

No particular words are required to constitute a lease. Any writing will suffice if it establishes the intention of one party to voluntarily dispossess itself of the premises in return for consideration and of the other party to assume possession thereof for a prescribed period. *Schweit-*

*zer v. Evans*, 360 Pa. 552, 555, 63 A.2d 39, 40 (1949).

■ In a bona fide lease, the interest of the lessee is equivalent to that of a purchaser of the premises for the term of the lease. *Commonwealth v. Monumental Properties, Inc.*, 459 Pa. 450, 470–72, 329 A.2d 812, 822–23 (1974). As one court stated long ago:

> A lease is a sale and conveyance of the property leased, which only differs from what is called a deed, in being limited to a term certain, and leaving a reversionary interest in the grantor. . . . From the moment of letting, the land becomes the tenant's and remains such until the lease terminates; the house, if there be one, is his castle.

*Wien v. Simpson*, 2 Phila. 158, 158 (Pa. Dist.Ct.1856).

■ Determining whether an agreement is a "true" lease or a financing device requires examination of the particular facts and circumstances of each case. What at first glance looks to be a lease may upon further scrutiny reveal itself to be a disguised financing device. *Nath*, 282 Pa.Super. at 148, 422 A.2d at 871.

■ Our review of the circumstances surrounding the agreement between PHA and SMG which is at issue here leads us to conclude that it was **not** a "true" (or bona fide) lease whereby SMG conveyed to PHA the right to use the Civic Arena so the Penguins could play their home games there. Rather, it was a financing device masquerading as a lease, so as to allow Howard Baldwin to purchase the team while providing a stream of money to SMG to reimburse it for the cash infusion and for its efforts in running the facility.

A complex series of agreements and transactions occurred on October 31, 1991, which culminated in PHA becoming the owner of the NHL franchise known as the Pittsburgh Penguins.

Among other things, CAC and SMG executed, with PHA's consent, an agreement whereby CAC assigned to SMG all of CAC's rights to the Civic Arena arising out of its sublease with PAA. Contemporaneously therewith, SMG purportedly subleased the Civic Arena to PBT, which in turn transferred to PHA its interest in the Penguins along with the purported sublease it had just entered into with SMG. The term of the purported sublease was to expire on September 1, 2012, "unless terminated earlier hereunder".

According to Article III, § 315(2) of their agreement, SMG has the right under certain conditions to relocate the Penguins to an "alternative facility" of SMG's choosing. No geographical limitations were set upon the locus of the alternative facility. Nothing would seem to prohibit SMG from relocating the Penguins to an alternative facility located, say, two thousand miles from the Civic Arena. If PHA did not timely reject the alternative facility chosen by SMG, PHA and SMG were required to execute an amendment to their agreement reflecting the fact of relocation to the alternative facility. Such amendment could not, however, affect any of the terms of their agreement unless a particular term was "inapposite" relative to the alternative facility.

According to Article III, § 315(3) of their agreement, PHA has the right under certain conditions to relocate to an "alternative facility" acceptable to SMG. Should it relocate the Penguins, however, PHA must require the owner of the alternative facility to enter into a lease agreement with SMG, which then shall amend its agreement with PHA to reflect the relocation and which shall not affect any terms of the previous agreement unless a particular term was "inapposite" relative to the alternative facility. Among other things, the agreement requires PHA to guarantee SMG the stream of income it would have enjoyed at the Civic Arena had relocation not taken place.

These provisions lead us to conclude that the agreement between PHA and SMG whereby the Penguins were to play

all of their home games at the Civic Arena is not a "true"—i.e., bona fide—lease, as the concept was defined previously.

The agreement did **not** convey, grant, or demise the Civic Arena to PHA during the term of the lease. We have just seen how the above provisions of their agreement gave SMG the right (under certain conditions) to relocate the Penguins to another facility, which could be virtually anywhere. If it did so, the terms of their agreement had to be amended only to reflect the fact of relocation and to change any terms that were "inapposite" relative to the alternative facility. All other terms of the agreement, including those which provided the basis on which PHA paid SMG for permitting the Penguins to pay at the Civic Arena remained in effect.

Also, the agreement provided that PHA itself could under certain conditions relocate the Penguins to another facility. It could do so, however, only if the owner of the alternative facility first entered into a lease with SMG, which in turn would sublease the alternative facility to PHA under terms which would guarantee the stream of income SMG would have enjoyed had the Penguins remained at the Civic Arena.

In our estimation, these requirements negate the proposition that PHA in effect had purchased the Civic Arena for a specified term, one of the requirements for a lease, so that the Penguins could play there.

The matter does not end there. The requirement that a lease be for a prescribed period of time also is lacking in this instance. The term of their agreement was to expire on September 1, 2012, "unless terminated earlier". Such an indefinite term is inconsistent with the requirement that a lease be for a "prescribed period".

The agreement between SMG and PHA for use of the Civic Arena was in reality a financing device masquerading as a lease.

When Howard Baldwin came up short in his quest to purchase the Penguins from DeBartolo, he approached an individual about providing the necessary funds to enable the sale to go through. Due to this individual's ownership of a substantial portion of another NHL franchise, NHL rules prohibited this individual from contributing the needed funds in exchange for an equity interest in the Penguins or from lending the money to Baldwin. To make his participation palatable to the NHL, this individual (and others) created SMG, which then contributed $24,000,000 ostensibly in return for acquiring CAC's rights to the Civic Arena under its sublease with PAA. Its contribution in reality was a **loan** to Baldwin's group to enable them to complete their purchase of the Penguins.

The above-cited provisions of the above agreement between SMG and PHA (as successor to PBT), were inserted to provide a steady stream of payments to SMG. Even if the Penguins ceased playing in the Civic Arena and moved to another facility it ensured that PHA would fully repay SMG the funds it had loaned to Baldwin and his co-investors. We would expect to find such provisions in a financing transaction, not in a bona fide lease.

A compelling piece of extrinsic evidence in support of this conclusion is the security agreement SMG drafted which granted SMG a security interest in basically all of the Penguins assets. Despite repeated demands by SMG that it do so, neither PBT nor PHA executed the agreement. SMG would not have so acted unless it had loaned $24,000,000 to PHA and intended the so-called lease to be a financing device rather than a bona fide lease.

Both PHA and SMG urge us to take the following factors into consideration in determining whether or not the above agreement between them is a bona fide lease:

(1) whether the amount of the rent was calculated to compensate for use of the property or was based on some other purpose, such as ensuring a particular return on an investment;

(2) whether the property was purchased by the lessor specifically for the lessee's use;

(3) whether the transaction was denominated a lease to gain certain tax advantages;

(4) whether the lessee assumed obligations normally assumed by the lessor; and

(5) whether the agreement permits the lessee to purchase the property for a nominal sum at the end of the lease.

*City of Olathe, Kansas v. KAR Development Associates (In re KAR Development Associates)*, 180 B.R. 629, 639 (D.Kan. 1995) (*citing to In re Hotel Syracuse, Inc.*, 155 B.R. 824, 838–39 (Bankr.N.D.N.Y. 1993)).

We are not convinced that these factors are relevant to determining in this instance whether or not the agreement between SMG and PHA is a bona fide lease. These factors were articulated for determining whether an agreement between SMG and PHA is a bona fide lease for purposes of 11 U.S.C. §§ 365(d)(4) and 502(b)(6). We are not here concerned with these provisions of the Bankruptcy Code but instead with whether the agreement is a bona fide lease at all under state law. In addition, these cases were concerned with rejection of equipment leases. The purported lease at issue here does not concern equipment.

To the extent these cases are relevant, they indicate on balance that the above agreement is **not** a lease for purposes of 11 U.S.C. §§ 365(d)(4) and 502(b)(6).

We already have determined that the agreement between SMG and PHA was structured as a covert financing device to ensure that SMG would receive a return on the loan it had made to enable the Baldwin-led group of investors to purchase the Penguins from DeBartolo.

SMG acquired CAC's rights under its sublease with PAA for the purpose of providing a vehicle whereby the loan it made to the Baldwin group could be disguised as a lease. It acquired the ostensible sublease so the Penguins could play in the Civic Arena and generate revenues to repay the loan.

Although calling the transaction a lease apparently did not provide any tax advantages, it was so denominated to make it palatable to the NHL. The record does not indicate whether the NHL was aware of this subterfuge.

Finally, as the purported lessee, PHA assumed the obligation of paying for certain improvements to the Civic Arena. SMG, whose purported interest in the Civic Arena was greatly enhanced by such improvements, paid nothing for them.

Based on all the foregoing, we conclude that the agreement between SMG and PHA concerning use of the Civic Arena for staging Penguins hockey games was not a "true" lease but was instead a financing device to ensure that PHA repaid a loan SMG had made to enable the group led by Howard Baldwin to purchase the Penguins.

## II. Rejection Of The Lease

It is not necessary in light of the determination that the agreement between SMG and PHA is not a bona fide lease to determine whether PHA can reject it. To the extent that said agreement is a true lease, we shall consider out of an abundance of caution whether PHA may reject it in accordance with the Bankruptcy Code.

With the bankruptcy court's approval, a chapter 11 debtor-in-possession may reject an unexpired lease to which it is a party. 11 U.S.C. §§ 365(a) and 1107(a).

Rejection cuts off any right of the other party to the lease to require debtor to perform and limits their claim to one for breach of contract. *University Medical Center v. Sullivan (In re University Medical Center)*, 973 F.2d 1065, 1075 (3rd Cir. 1992).

If the unexpired lease was not previously assumed during the bankruptcy case, the resultant breach is deemed to have occurred immediately **before** the filing of the bankruptcy petition. 11 U.S.C. § 365(g)(1). Any allowed claim arising therefrom is treated as a prepetition claim for damages. *In re Klein Sleep Products, Inc., Nostas Associates v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18, 26 (2d Cir.1996). The measure of the resultant damages is set at 11 U.S.C. § 502(b)(6).

The appropriate standard we must apply in determining whether or not to approve rejection under § 365(a) of the Bankruptcy Code is the so-called "business judgment" test. *N.L.R.B. v. Bildisco and Bildisco (In re Bildisco)*, 682 F.2d 72, 79 (3d Cir.1982), *aff'd*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

To prevail on its motion to reject, debtor must establish that rejection is in the best interest of the estate and of unsecured creditors. *In re Klein Sleep Products*, 78 F.3d at 25.

We should not substitute our own judgment for that of debtors but should instead allow rejection to take place if the motion is not manifestly unreasonable and not in bad faith and would seem to enhance debtors' estate. *Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 567 n. 16 (8th Cir.1997).

SMG has objected to debtors' motion to reject its sublease with SMG. According to SMG, rejection of the agreement does not pass muster under the business judgment rule. Rejection of the sublease, it insists, is not a reasonable business judgment in that it will leave the Penguins without a place to play its home hockey games next season and will result in "immediate and total devastation of fan support". We disagree.

To begin with, SMG's unarticulated premiss that the Penguins will not have a venue in which to play its home games if PHA rejects its present sublease with SMG is not necessarily true. The possibility remains that the plan proposed by SMG and Fox Sports Pittsburgh will carry the day and be confirmed over competing plans. If this occurs, we would expect that SMG will quickly negotiate a new agreement with the reorganized debtor which will have the Penguins playing in the Civic Arena next hockey season. Even if their plan is not confirmed and the Lemieux-led plan is confirmed instead, there still will remain time for the reorganized debtor and SMG to arrive at a mutually acceptable new agreement. Both sides would have powerful economic incentives to do so. The Penguins will need a facility in which to play home games. SMG will need to come to terms with the reorganized debtor or else be in material default of its lease with PAA and risk having PAA terminate the lease and deal directly with the reorganized debtor.

The matter does not end there. We also are persuaded that PHA's rejection of the present sublease is in the best interest of its bankruptcy estate and comports with the requirements of the business judgment rule. If the present agreement is not the most onerous in the NHL, it is near the top of the list.

PHA presently pays SMG between $6,000,000 and $7,000,000 per year, a tenfold increase over the rent paid to PAA by CAC and DCC, and also pays several million dollars more per year for improvements made to the Civic Arena which are included in SMG's leasehold interest. SMG pays nothing for these improvements. In addition to receiving a substantial base rent, SMG presently retains 92.5% of revenues derived from sales of programs and novelties, 100% of parking revenues, and 80% of revenues from sales of food and beverages. It also receives a substantial percentage of ticket sales for various seats and suites at the Civic Arena, of income derived from the Igloo Club, and of advertising revenues.

Not only does PHA not derive any revenue from non-hockey events staged at the Civic Arena, it also is required to compensate SMG for revenues lost by SMG as a result of decreased seating capacity due to construction of Igloo Club seats in 1997.

PHA has lost approximately $50,000,000 during the past three hockey seasons. The cost to PHA of operating under the provisions of the agreement with SMG during that same period is approximately $30,000,000, which equals some 60% of its operating losses. Rejection of the current agreement with SMG and negotiation of a new one will go a long way towards rectifying this problem.

Neither PHA nor any reorganized debtor could continue to operate for very long under the provisions of the present agreement with SMG. No feasible plan of reorganization is likely as long as the agreement remains in effect.

Even the plan of reorganization proposed by SMG and Fox Sports Pittsburgh supports this conclusion. While their plan does not propose altering any of the terms of the sublease with SMG, they do propose that PAA assume the cost of paying for improvements made to the Civic Arena and propose that the City of Pittsburgh and County of Allegheny effectively subsidize payment of amusement taxes for events held at the Civic Arena. Their proposed plan would merely shift to other creditors the burden of defraying other costs of doing business at the Civic Arena while leaving the onerous provisions of the agreement unchanged.

While SMG's contention that rejection of the sublease is not in the best interest of PHA's bankruptcy estate at first blush may appear plausible, further reflection convinces us that rejection of the sublease is the only remaining reasonable course of action available and is in the best interest of PHA's bankruptcy estate.

Rejection of the sublease will leave PHA (at least for the time being) in the admittedly perilous position of not having a place to play its home games. So doing, however, also will **maximize** the probability that a reorganized debtor will succeed in negotiating an agreement containing more favorable terms which will enable it to continue operating at the Civic Arena and to remain viable. When viewed from this perspective, it becomes apparent that PHA's request to reject the present sublease is in the best interest of its bankruptcy estate.

We are optimistic that the reorganized debtor and SMG will successfully arrive at a new agreement that is mutually acceptable to both parties while relieving the reorganized debtor of some of the intolerable provisions of the present agreement and enabling it to survive as a viable entity. While it unquestionably could happen that SMG and a reorganized debtor might not succeed in negotiating a new agreement on terms which would enable the latter to survive, SMG in that event would be in default of its agreement with PAA and would risk having its agreement with PAA terminated. It is precisely this "Sword of Damocles" hanging over the heads of both parties that makes reasonable PHA's request to reject its sublease with SMG.

PHA's rejection of its sublease with SMG may or may not result in SMG receiving rejection damages as a result of the breach that will occur. While agreeing that SMG in principle is entitled to rejection damages, the parties disagree concerning whether or not such damages are appropriate in this instance. We need not address this issue now and will not do so unless SMG submits a claim for rejection damages and an interested party objects.

An appropriate order shall issue.